IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

Stephen J. Green, # 259765,       )
                         )    Case No. 0:22-cv-1634-SAL-PJG
        Plaintiff,     )
                         )
v.                          )
                         )    **MEMORANDUM IN SUPPORT**
Director Brian Sterling, Warden Charles  )    **OF DEFENDANTS'**
Williams, and Deputy Warden John Palmer, )  **MOTION FOR SUMMARY JUDGMENT**
                         )
        Defendants.   )
                         )
_____)

COME NOW Bryan Stirling,[1] Charles Williams, and John Palmer, Defendants in the above-entitled action, who respectfully show this Honorable Court the following:

### STATEMENT OF FACTS

Plaintiff is an inmate in the custody of the South Carolina Department of Corrections (hereinafter "SCDC), serving two life sentences for two first-degree burglary convictions, as well as multiple 30-year sentences for first-degree criminal sexual conduct, kidnapping, and armed robbery. (Ex. A at 1; *see also* Harouff Aff. ¶ 3) Plaintiff has been in SCDC's custody since July 19, 1999. (Ex. A at 1) "He is believed to have been involved in the Lee Correctional Institution riots of 2018, and was indicted for his alleged role." (Harouff Aff. ¶ 3) On June 19, 2018, Plaintiff was transferred to the custody of the State of Mississippi, and subsequently came back into SCDC's custody at Kirkland Correctional Institution (hereinafter "KCI" or "Kirkland") on July 3, 2021, to face charges stemming from the riot. (Id.; *see also* Ex. A at 4) Plaintiff was then transferred to Perry Correctional Institution (hereinafter "PCI" or "Perry") six days later, where

_____

[1] Defendants note this reflects the proper spelling of this party's name.

he was placed in the Restrictive Housing Unit (hereinafter "RHU") due to his heightened security level.  (Id.; *see also* Harouff Aff. ¶¶ 4-5)

Plaintiff filed his Complaint on May 23, 2022.  (*See* Dkt. 1) Plaintiff brings claims pursuant to 42 U.S.C. § 1983 for purported violations of his First, Fourth,[2] Eighth, and Fourteenth Amendment rights, (id. at 4); a claim premised upon the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a) (hereinafter "RLUIPA") (id.); and claims premised upon the Constitution of South Carolina.  (Id.) Each Defendant is sued in his individual and official capacities.  (Id. at 2-3) Plaintiff seeks nominal, compensatory, and punitive damages in various amounts, as well as a permanent injunction of an unspecified nature.  (Id. at 6)

## ARGUMENT

## PLAINTIFF'S FEDERAL CLAIMS

**I.    Defendants are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies.**

The Prison Litigation Reform Act (hereinafter "PLRA") was enacted with the goal of reducing "the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints."  El-Amin v. Smith, 637 F.3d 1192, 1195 (11th Cir. 2011).  It provides, in part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The United States Supreme Court has held the exhaustion requirement is mandatory.  Porter v. Nussle, 534 U.S. 516, 524

---

[2] Defendants are unable to positively determine whether Plaintiff wrote "4th" or "14th" in his Complaint.  (*See* Dkt. 1 at 4, § B).  Because Plaintiff later explicitly wrote "Equal Protection of Law" as a cause of action, to avoid a reading which would be duplicative Defendants assume the prior designation relates to a Fourth Amendment claim.

(2002); *see also* Anderson v. XYZ Corr. Health Svcs., Inc., 407 F.3d 674, 677 (4th Cir. 2005). While all available remedies must be exhausted, "those remedies need not meet any federal standards, nor must they be 'plain, speedy and effective.'" Porter, 534 U.S. at 524 (quoting Booth v. Churner, 532 U.S. 731, 739 (2001)). Ultimately, the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Id. at 532.

Inmates must complete the administrative review process within the applicable procedural rules as a precondition to bringing suit in federal court. Woodford v. Ngo, 548 U.S. 81, 83-85 (2006). "Corrections officials concerned about maintaining order in their institutions have a reason for creating and retaining grievance systems that provide—and that are perceived as providing—a meaningful opportunity for prisoners to raise meritorious grievances." Id. at 102. "Exhaustion [of the grievance system] gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of the [the agency's] procedures.'" Id. at 89 (quoting McCarthy v. Madigan, 503 U.S. 140, 145 (1992) (second alteration in original)). The Supreme Court has taken pains to note that "'even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration.'" Id. at 89 (quoting McCarthy, 503 U.S. at 145); *see also* id. at 94 (noting "proper exhaustion often results in the creation of an administrative record that is helpful to the court."); Jones v. Bock, 549 U.S. 199, 219 (2007) ("We have indentified the benefits of exhaustion to include allowing a prison to address complaints . . . before being subjected to suit, . . . and improving litigation that does occur by leading to the preparation of a useful record."); Wilcox v. Brown, 877 F.3d 161, 167 n.4 (4th Cir. 2017) (same).

The Court in <u>Woodford</u> thus determined "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." 548 U.S. at 90-91; *see also* <u>Jones</u>, 549 U.S. at 217-18 (noting the requirement of proper exhaustion "was not satisfied when . . . prisoners had missed deadlines set by the grievance policy" and compliance "with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'").  The Court has explicitly recognized that "unless noncompliance carries a sanction," prisoners would have little reason to comply with a prison's "critical procedural rules," and specifically commented "[w]e are confident that the PLRA did not create such a toothless scheme." <u>Woodford</u>, 548 U.S. at 95.

Ultimately, where a prisoner's claims are raised for the first time before a federal court, summary dismissal for failure to exhaust his administrative remedies is required.  <u>Green v. Young</u>, 454 F.3d 405, 409 (4th Cir. 2006) (noting "routine" dismissals are those "where the prisoner's claims have been presented to a court for the first time."); *see also* <u>McClean v. United States</u>, 566 F.3d 391, 397 (4th Cir. 2009) (noting the provisions of the PLRA "'were meant to curb the *substantively meritless* prisoner claims that have swamped the federal courts.'") (internal citation omitted) (emphasis in original).

SCDC's Grievance System involves a three-step process which is mandatory.  (McKie Aff. ¶¶ 7, 17)  "Inmates who take steps outside the grievance process, whether in making complaints verbally or in writing, or by having others make complaints on their behalf, or by attempting to shortcut or ignore various steps in the process, are not participating in SCDC's grievance process."  (<u>Id</u>. at ¶ 18)  First, except in cases of disciplinary convictions or custody reductions, an inmate must attempt to resolve the issue through informal resolution by submitting

a Request to Staff Member Form (hereinafter "RTSM") within eight working days of the incident.  (Id. at ¶ 7) After a response to the RTSM is received, the inmate may file a Step 1 grievance, which requires the submission of supporting documentation, which would include the answered RTSM form.  (Id. at ¶¶ 10-11)

If the Step 1 grievance is returned due to missing information, the inmate must submit a new grievance which corrects any deficiencies noted in the first grievance, or appeal to the Chief of the Inmate Grievance Branch within ten working days of the unprocessed grievance being returned.  (McKie Aff. ¶ 13) On the other hand, if the Step 1 grievance is processed and returned with a Warden's Decision and the inmate is unsatisfied with the same, the inmate must appeal this action by filing a Step 2 grievance within five calendar days of the response.  (Id. at ¶ 14) The response to the Step 2 grievance is considered the agency's final decision on the issue.  (Id. at ¶ 15) Only after an inmate has received a response to his Step 2 grievance is his claim deemed exhausted.  (Id.) See also SCDC Inmate Grievance System Procedures, GA-01.12 (May 12, 2014), §§ 13.1 – 13.10.[3]

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but *it is the prison's requirements*, not the PLRA, *that define the boundaries of proper exhaustion*." Jones v. Bock, 549 U.S. 199, 218 (2007) (emphases added).  "*Any other approach would allow a prisoner to 'exhaust' state remedies by spurning them*, which would defeat the statutory objective of requiring the prisoner to give the prison administration an opportunity to fix the problem . . . and perhaps shed light on factual disputes that may arise." Pozo v. McCaughtry, 286 F.3d 1022, 1023-24 (7th Cir. 2002)

---

[3] Available at www.doc.sc.gov/policy/policy.html.  *Cf*. Hall v. Virginia, 385 F.3d 421, 423 at n.3 (4th Cir. 2004) (taking judicial notice of factual information located in postings on government websites).

(emphasis added).  Notably, SCDC's procedural rules dictate that inmates are "allowed to submit only one issue per incident or circumstances on each grievance form."  (McKie Aff. ¶ 16) This requirement makes tracking inmate complaints easier, and provides the additional benefit of getting inmates to focus on a specific problem and its potential solution rather than simply complain in general.  (Id.)

Plaintiff filed four Step 1 grievances prior to the date his action was filed on May 23, 2022.  (McKie Aff. ¶ 19) The first of these, filed on July 7, 2021, complained he was "assaulted" with a haircut upon his arrival at KCI on July 2, 2021, despite his religious beliefs and his contention he was only going to be in SCDC's custody for two weeks for a court appearance. (McKie Aff. ¶ 20 & Ex. A) The grievance was returned to Plaintiff because he failed to attempt informal resolution through the use of an RTSM prior to filing the grievance.  (Id. at ¶ 21 & Ex. A)  Plaintiff did not file a Step 2 appeal of the decision.  (Id. at ¶ 21) The second Step 1 grievance was filed on July 12, 2021, and was essentially duplicative of Plaintiff's prior grievance.  (See id. at ¶ 22 & Ex. B at 1) As with the first, the grievance was not processed due to Plaintiff's failure to pursue informal resolution prior to filing the Step 1 form.  (Id. & Ex. B at 2) The IGC at Perry took pains to explain the informal resolution requirement and its procedures to Plaintiff in the response.  (McKie Aff. Ex. B at 2) No Step 2 appeal was filed.  (Id. at ¶ 22)

Plaintiff filed a third Step 1 grievance the day after receiving the response to the second. (McKie Aff. ¶ 23 & Ex. C at 1) For the first time, Plaintiff asserted transgender inmates were allowed to have long hair while "straight" inmates were being assaulted with forced haircuts. (Id.) "Again, this grievance was not processed due to [Plaintiff's] failure to pursue an informal resolution prior to filing the grievance."  (Id. at ¶ 23 & Ex. C at 2) As before, no Step 2 grievance was filed to appeal the IGC's decision.  (Id.)

Plaintiff filed a fourth Step 1 grievance on July 22, 2021. (McKie Aff. ¶ 24 & Ex. D at 1) Plaintiff complained that transgender inmates were allowed to grow out their hair "but that hair cuts were forced upon 'inmates who wish to practice' their 'religious beliefs.'" (Id.) In the "Action Requested" portion of the grievance, Plaintiff asserted if transgender inmates were allowed to grow out their hair, as well as to wear makeup and female underwear, then SCDC must quit forcing haircuts upon "the Rasta, Muslim, and Jewish population." (McKie Aff. Ex. D at 1) "He asked to be allowed to grow his hair 'just like you allow the transgender population,'" yet nowhere within the grievance did Plaintiff assert he was a member of any of those identified religious groups. (Id. at ¶ 24)

Because it was properly filed, this Step 1 grievance was processed and a Warden's Decision was rendered on August 21, 2021. (McKie Aff. ¶ 25) Plaintiff's grievance was denied under the rationale he could only grieve his own issues, not those of the Rasta, Muslim, and Jewish populations in general. (See McKie Aff. Ex. D at 2) A provision of the grooming standards policy was recited within the Decision. (Id. at ¶ 25 & Ex. D at 2) Plaintiff filed a timely Step 2 appeal related to this grievance wherein he asserted that not allowing an exception to the grooming standards policy for the Rastafarian population while allowing an exception for the transgender population was "discrimination" which violated various provisions of law. (Id. at ¶ 26 & Ex. E at 1)  The response to Plaintiff's appeal noted he was not transgender and he had to comply with the grooming standards within the RHU. (Id. at ¶ 27 & Ex. E at 2) Notably, nowhere in the Step 2 grievance did Plaintiff ever assert he was Rastafarian, nor did he claim to be transgender.[4]  (Cf. Mckie Aff. Ex. D at 1 & Ex. E at 1)

---

[4] Defendants recognize that elsewhere Plaintiff seems to contend he asserted within these grievances that he was Rastafarian.  For example, in Plaintiff's Motion to Strike filed on September 9, 2022, Plaintiff states: "Plaintiff's Step (2) grievance asserted Plaintiff's rights to

Thus, the only claim properly exhausted by Plaintiff through the use of a Step 2 grievance deals with SCDC allowing transgender inmates to have long hair, while requiring those who are not transgender to comply with the standard grooming policy.[5] (*See* McKie Aff. ¶¶ 24-27) This clearly raises a potential equal protection action under the Fourteenth Amendment.  (*See* Mckie Aff. Ex. D at 1 & Ex. E at 1) Yet Plaintiff now brings claims related to freedom of religion under the First Amendment and RLUIPA, (Dkt. 1 at 4); various "use of force" incidents, (*see* Dkt. 1 at 5 & Dkt. 1-2), including assertions he was slammed "on the ground," suffering mental health breakdowns and a low back injury, (Dkt. 1 at 6); and a denial of medical care for both issues. (*See* id.)  Each of these additional claims must be dismissed because they have not been properly exhausted through SCDC's administrative process.  *See* Green, 454 F.3d at 409 (noting "routine" dismissals are those "where the prisoner's claims have been presented to a court for the first time.").

SCDC's grievance system imposes a "single issue per grievance" rule which cannot be judicially voided because "it is the prison's requirements, not the PLRA, that define the boundaries of proper exhaustion."  Jones, 549 U.S. at 218.  An inmate's "[f]ailure to do what the state requires," such as adhering to the one-issue-per-grievance rule, "bars, and does not just postpone, suit under § 1983."  Pozo, 286 F.3d at 1024.  Phrased another way, interpreting Plaintiff's operative Step 1 and Step 2 grievances as anything other than a potential equal protection complaint would require this Honorable Court to read into the grievances *language*

---

practice 'his' religious belief[]s, the same as transgender inmates are permitted to practice 'their' belief[]s. . . ."  (Dkt. 36 at 3) However, both the Step 1 and Step 2 grievances discussed herein speak for themselves, and completely belie Plaintiff's assertion.  Nowhere in these grievances does Plaintiff assert he is Rastafarian, nor that he is being discriminated against because of his religion.  (*See* Mckie Aff. Ex. D at 1 & Ex. E at 1)

[5] As Plaintiff was housed in the RHU, the grooming standards applicable to him are contained in Section 35.1 of OP-22.38, available at www.doc.sc.gov/policy/policy.html.

*which simply does not exist.* This would "allow [Plaintiff] to 'exhaust' state remedies by spurning them," which is prohibited. Pozo, 286 F.3d at 1023.

Accordingly, because they are raised for the first time before this Honorable Court, Plaintiff's claims under the First, Fourth, and Eighth Amendments, as well as RLUIPA, are barred as a matter of law, and Defendants are entitled to summary judgment for failure to exhaust administrative remedies as to these claims. 42 U.S.C. § 1997e(a); Jones, 549 U.S. at 218; Porter, 534 U.S. at 524, 532; Woodford, 548 U.S. at 83-84; Pozo, 286 F.3d at 1024; Green, 454 F.3d at 409; FED. R. CIV. P. 56(a). Defendants acknowledge Plaintiff properly exhausted his Fourteenth Amendment equal protection claim. (*See* Mckie Aff. Ex. D at 1 & Ex. E at 1)

## II.     Defendants are entitled to summary judgment in their official capacities regarding Plaintiff's § 1983 claims because the Eleventh Amendment and sovereign immunity bar these actions.

The Eleventh Amendment states, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." U.S. Const. amend. XI. Over a hundred years ago, the U.S. Supreme Court noted:

> Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own state in the federal courts, while the idea of suits by citizens of other States, or of foreign states, was indignantly repelled? Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States, can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face.

Hans v. Louisiana, 134 U.S. 1, 15 (1890). Citing Hans, the Court later noted: "The Eleventh Amendment grants a State immunity from suit in federal court . . . by its own citizens as well." Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 616 (2002).

Indeed, the South Carolina Supreme Court has taken the view that "[t]he Eleventh Amendment prohibits non-consenting states from being sued in federal or state court by private individuals." United Student Aid Funds v. S.C. Dep't of Health and Env'l Control, 356 S.C. 266, 273, 588 S.E.2d 599 (2003) (citing Board of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356 (2001)).[6] There is no doubt that South Carolina has not consented to suit in federal court. With the passage of the S.C. Tort Claims Act, the legislature explicitly stated, "Nothing in this chapter is construed as a waiver of the state's. . . immunity from suit in federal court under the Eleventh Amendment to the Constitution." S.C. CODE § 15-78-20(e).

More recently, the U.S. Supreme Court has noted "that the States have retained their traditional immunity from suit, 'except as altered by the plan of the [Constitutional] Convention or certain constitutional amendments.'" Virginia Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 253 (2011) (quoting Alden v. Maine, 527 U.S. 706, 713 (1999)); see also Coleman v. Court of Appeals of Md., 132 S.Ct. 1327, 1333 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."). This is because the Court has "understood the Eleventh Amendment to confirm the structural understanding that States entered the Union with their sovereign immunity intact, unlimited by Article III's jurisdictional grant." Stewart, 563 U.S. at 253.

Ultimately, "Congress may abrogate the States' immunity from suit pursuant to its powers under § 5 of the Fourteenth Amendment," but only when it has made "'its intention to abrogate unmistakably clear in the language of the statute.'" Coleman, 132 S.Ct. at 1333 (quoting Nevada

---

[6] In Alden v. Maine, 527 U.S. 706 (1999), the Court recognized it had referred to the States' immunity from suit as "Eleventh Amendment immunity," but that the "phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment." Id. at 713.

Dept. of Human Resources v. Hibbs, 538 U.S. 721, 726 (2003)); *see also* Welch v. State

Department of Transportation, 483 U.S. 468, 483 (1987) (requiring the "unmistakably clear

language" standard before an abrogation of Eleventh Amendment immunity will be found).

Notably, in Will v. Michigan Department of State Police, 491 U.S. 58 (1989), the Court

determined that the language of section 1983 "falls far short of satisfying the ordinary rule of

statutory construction that, if Congress intends to alter the 'usual constitutional balance between

the States and the Federal Government,' it must make its intention to do so unmistakably clear in

the language of the statute.'"  491 U.S. at 65 (quoting Atascedero State Hospital v. Scanlon, 473

U.S. 234, 242 (1985)); *see also* United, 356 S.C. at 273 (noting Congress must comply with the

"plain statement rule" by "unequivocally stating in 'clear and manifest' language its intent to

abrogate the [state's sovereign] immunity.").

     Because the language of section 1983 lacks a clear statement abrogating its sovereign

immunity pursuant to Congress' powers under section 5 of the Fourteenth Amendment, the State

of South Carolina continues to possess such immunity in both state and federal court in any

action brought under that statute.  *See* Alden, 527 U.S. at 749; Coleman, 132 S.Ct. at 133; Will,

491 U.S. at 65; Quern v. Jordan, 440 U.S. 332, 342 (1979).  Accordingly, Defendants are entitled

to summary judgment in their official capacities.  FED. R. CIV. P. 56(a).

### III.    Defendants are entitled to summary judgment regarding Plaintiff's Fourteenth Amendment equal protection claim because he has not been treated differently from similarly situated inmates within the RHU, nor can he show that any actions against him were the result of purposeful discrimination.

     The Fourteenth Amendment's equal protection clause dictates that no "state . . .  shall

deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. AMEND.

XIV, § 1.  To succeed on an equal protection claim, "'a plaintiff must first demonstrate that he

has been treated differently from others with whom he is similarly situated and that the unequal

treatment was the result of intentional or purposeful discrimination.'" Burke v. Clarke, 842 Fed. Appx. 828, 837 (4th Cir. 2021) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)); *see also* Kolbe v. Hogan, 849 F.3d 114, 146 (4th Cir. 2017) (same), abrogated on other grounds by New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).  "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  Morrison, 239 F.3d at 654.

Here, Plaintiff was confined to the RHU at Perry after being returned to SCDC's custody from the State of Mississippi.  (Harouff Aff. ¶¶ 3-4) Plaintiff's custody level dictated he must be held either in the RHU or the Substantial Security Risk Unit at Kirkland.  (Id. at ¶¶ 4, 6) RHU inmates "are housed individually, allowed out of their cells only for recreation and showers, receive their meals within their cells, are not allowed visits or use of the commissary, and are limited to one telephone call per week."  (Id. at ¶ 6)  Whenever RHU inmates are removed from their cells they are subjected to a strip search, and are restrained using handcuffs, leg irons, and a retrieval chain.  (Id. at ¶ 9) Due to the elevated security concerns, their cells are searched each time they are removed from the cell, and every week to ten days for those who do not leave their cells.  (Id. at ¶ 14)

Inmates within the RHU are bound by the policy governing grooming standards in the RHU.[7]  (Harouff Aff. ¶ 16) This provision requires RHU inmates to comply with the general inmate grooming standard applicable to male SCDC inmates overall, which provides that hair can be no more than one inch in length, and facial hair no longer than one-half inch in length.[8]  (*See* id.) "Those who refuse to voluntarily comply with the grooming policy are restrained and

_____

[7] See note 5, *supra*.
[8] The general grooming standards for male inmates are located in Section 1.1 of OP-22.13, available at www.doc.sc.gov/policy/policy.html.

given haircuts, but this is not a spontaneous event. Such an occurrence would be planned and videotaped, as required by policy." (Id.) Notably, Plaintiff has never refused a haircut such that a planned use of force occurred. (Id. at ¶ 17) Instead, there was a single incident where Plaintiff "unexpectedly jumped up from the chair and was restrained on the ground." (Id.)

The reason for such a stringent standard within the RHU is SCDC's recognition that long hair, especially in the form of dreadlocks, creates multiple security risks. (Harouff Aff. ¶¶ 10-13, 15) Long hair and beards provide hiding spaces for contraband, including drugs and small keys, such as those used to open restraints within the prison. (Id. at ¶ 10-11) "In addition to the concern of an inmate possessing a factory-made handcuff key, SCDC works diligently to locate and seize homemade handcuff keys which may be produced by prisoner A and later transferred to prisoner B."[9] (Id. at ¶ 11)

Long hair cannot be easily searched on a visual basis, but must be physically searched by an officer running his fingers through the hair to detect prohibited items. (Id. at ¶ 12) Dreadlocks are banned because "[t]here is a history of prisoners placing razor blades, needles, hooks, pins, staples, and other small objects capable of being sharpened in dreadlocks to be used as 'traps' to injure officers. This danger can lead to an increased risk of searches not being properly performed, thus allowing contraband to be moved within the prison environment." (Id.)

---

[9] As a corporal in 2004, now Deputy Warden Daniel Harouff was personally involved in locating and seizing a dozen homemade handcuff keys at Perry. (Harouff Aff. ¶ 11) While it is impossible for Defendants to prove the presence of a similar threat today, the fact such a large seizure of handcuff keys was made previously on a single day in 2004 demonstrates the risks with which prison administrators are confronted. See Cutter v. Wilkinson, 544 U.S. 709, 723 (2005) (noting due deference is owed to "the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources."); Turner v. Safley, 482 U.S. 78, 84-85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.").

Requiring RHU inmates to have short hair and beards means less time is required to search such inmates when they are removed from their cells, and thus the unit operates more efficiently.  (Harouff Aff. ¶ 13) Efficiency is obviously important because there is a limited number of correctional officers and other resources available within SCDC.  (Id. at ¶ 19) More notably, barring long hair and dreadlocks means personnel are not exposed to the physical risks of encountering traps hidden in an inmate's hair.  (Id. at ¶ 13)

Of additional concern is that inmates who are confined in the RHU nonetheless have to be transported outside the confines of the unit for medical treatment and court proceedings, and there are times when they must be housed elsewhere.  (Harouff Aff. ¶ 15) Escapes are an ever-present concern for SCDC, and inmates who are allowed to have long hair and beards can more easily alter their appearance following an escape.  (Id.) "The probable increase in the time required to locate and recapture such an inmate poses a risk to public safety."  (Id.) In short, as recognized by the Fourth Circuit, "[l]ong hair makes it possible for inmates to hide contraband in their hair and makes it more difficult for prison officials to identify inmates."  Burke, 842 Fed. Appx. at 838.

In the "Action Requested" portion of his exhausted grievance, Plaintiff requested: "Freedom to grow my hair just like you allow [the] transgender population." (Mckie Aff. Ex. D at 1) Thus the thrust of the grievance pursued to completion by Plaintiff is that male to female transgender inmates are held to a different grooming standard than inmates confined to the RHU. (*See* id.) Male-to-female transgender inmates compose an extraordinarily small proportion of the total inmates within SCDC.  As of this writing, there are approximately 32 such inmates across the prison system.  (James Aff. ¶ 5) Out of the 668 total inmates at Perry, there are only six male-to-female transgender inmates.  (Harouff Aff. ¶ 22)

"Male-to-female transgender inmates generally do not have a history of disciplinary violations, and do not typically pose the same security threat presented by the average male SCDC inmate."  (James Aff. ¶ 7; *see also* Harouff Aff. ¶ 22)  Whether considered as a function of "rioting, taking hostages, the manufacturing or movement of contraband (including homemade weapons), assaults towards other inmates or SCDC staff, or risks of escape," the security threats presented "are significantly lower with male-to-female transgender inmates as compared to the general population and inmates housed in elevated security or disciplinary units."  (James Aff. ¶ 8)

Pivotally, male-to-female "[t]ransgender inmates are allowed to conform to the female grooming standard, which allows them to have long hair.  [Yet] SCDC's female grooming standard does not allow females to wear dreadlocks, or to have twists in their hair, because of the security concerns associated with such hairstyles."[10]  (Harouff Aff. ¶ 23; *see also* James Aff. ¶ 6)  Thus, male-to-female transgender inmates are also not allowed to have dreadlocks.  (*See* id.)

It is abundantly clear that inmates confined in the RHU and male-to-female transgender inmates are not similarly situated to one another, because they are not "in all relevant aspects alike."  Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).  (*See generally* Harouff Aff. & James Aff.)  Thus, having different grooming standards for RHU inmates versus the relatively few male-to-female transgender is a perfectly rationale use of the expertise and informed judgment of SCDC officials.  *See* Turner v. Safley, 482 U.S. 78, 89 (1987) (noting that even when a prison regulation infringes on an inmate's constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests.").  Plaintiff is "similarly situated" only to other inmates within the RHU, and he has not been treated differently from such inmates.

---

[10] Section 1.2 of OP-22.13, available at www.doc.sc.gov/policy/policy.html.

Burke, 842 Fed. Appx. at 837; Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994 ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection."). Accordingly, Defendants are entitled to summary judgment as to Plaintiff's equal protection claim. Id.; Kolbe, 849 F.3d at 146; Morrison, 239 F.3d at 654; FED. R. CIV. P. 56(a).

Additionally, it is impossible for Plaintiff to demonstrate he has been subjected to "intentional or purposeful discrimination." Burke, 842 Fed. Appx. at 837. Given the security concerns involved for prisoners in the RHU, (see generally Harouff Aff.), to the extent Plaintiff asserts he is Rastafarian, (see Dkt. 1-2), Plaintiff cannot show he is required to have short hair because he is Rastafarian. Accordingly, Defendants are entitled to summary judgment regarding Plaintiff's equal protection claim on this separate ground. Burke, 842 Fed. Appx. at 838 (noting neither allegation raised by the plaintiff showed the Virginia Department of Corrections "applied the grooming policy to Burke because he was Rastafarian.") (emphasis in original); FED. R. CIV. P. 56(a).

## IV.    Defendants are entitled to summary judgment regarding Plaintiff's Fourth Amendment claim.

To the extent Plaintiff has asserted a claim arising under the Fourth Amendment, (see Dkt. 1 at 4 and note 2, supra), Defendants are entitled to summary judgment because Plaintiff is an inmate within a prison, and any excessive force claim is more properly analyzed under the Eighth Amendment. See Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996) (noting the Eighth Amendment "protects inmates from inhumane treatment and conditions while imprisoned."); Graham v. Connor, 490 U.S. 386, 394 (1989) (noting with appropriate citation that a "claim of excessive force to effect arrest [is] analyzed under a Fourth Amendment standard" while a "claim of excessive force to subdue [a] convicted prisoner [is] analyzed under an Eighth Amendment standard.") (alterations added). "Corrections officers act in a 'good faith

effort to maintain or restore discipline' – that is, with a permissible motive – not only when they confront immediate risks to physical safety, but also when they attempt to 'preserve internal order' by compelling compliance with prison rules and procedures." Brooks v. Johnson, 924 F.3d 104, 113 (4th Cir. 2019) (quoting Hudson v. McMillian, 503 U.S. 1, 6-7 (1992)). Accordingly, Defendants are entitled to summary judgment as to any Fourth Amendment claim asserted by Plaintiff. Fed. R. Civ. P. 56(a).

## V.    Defendants are entitled to summary judgment regarding Plaintiff's RLUIPA claim for money damages because only equitable relief is available under that provision of law.

To the extent this Honorable Court deems Plaintiff to have exhausted his claim under RLUIPA, (*cf*. Section I, *supra*), he seeks various forms of monetary damages against Defendants. (*See* Dkt. 1 at 4,6) As a matter of law, RLUIPA "plaintiffs may not pursue claims for money damages against state officials, and instead are limited to equitable relief." Gentry v. Robinson, 837 Fed. Appx. 952, 957 (citing Sossaman v. Texas, 563 U.S. 277, 288 (2011) (official capacity claims); Rendelman v. Rouse, 569 F.3d 182, 189 (4th Cir. 2009) (individual capacity claims)). Accordingly, Defendants are entitled to summary judgment as to any claims under RLUIPA for monetary damages. Fed. R. Civ. P. 56(a).

## VI.    Defendants are entitled to summary judgment regarding Plaintiff's RLUIPA claim to the extent Plaintiff seeks equitable relief.

To the extent this Honorable Court deems Plaintiff to have exhausted his claim under RLUIPA, (*cf*. Section I, *supra*), Plaintiff seeks an undefined "permanent injunction" against Defendants, which Defendants presume relates to his RLUIPA claim. (Dkt. 1 at 6) "[R]ecognition of the need for a proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers engaged in the administration of the State's [prisons] in the absence of a showing of irreparable injury which is

'both great and immediate.'" O'Shea v. Littleton, 414 U.S. 488, 499 (1974) (quoting Younger v. Harris, 401 U.S. 37, 46 (1971)); *see also* Los Angeles v. Lyons, 461 U.S. 95, 112 (1983) (noting "normal principles of equity, comity and federalism . . . should inform the judgment of federal courts when asked to oversee state law enforcement authorities.").

RLUIPA provides that a governmental entity may not impose a substantial burden on a prisoner's exercise of religion unless it shows the burden imposed on that person "1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). A plaintiff bears the burden of persuasion regarding whether the challenged policy substantially burdens his religious practice, whereas the governmental entity bears the burden of showing the policy is the least restrictive means of accomplishing a compelling governmental interest. *See* Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009).

Assuming *arguendo* that Plaintiff's religious practices are substantially burdened by the RHU grooming policy, Defendants are nonetheless entitled to summary judgment. "Security is the primary concern which governs all SCDC operations." (Harouff Aff. ¶ 19) As explained *supra*, inmates within the RHU are bound by the policy governing grooming standards in the RHU. (Id. at ¶ 16) This provision requires RHU inmates to comply with the general inmate grooming standard applicable to male SCDC inmates overall, and provides a mechanism for forced shaves and haircuts if inmates refuse to comply. (Harouff Aff. ¶ 16) Due to its higher custody level, RHU inmates "are housed individually, allowed out of their cells only for recreation and showers, receive their meals within their cells, are not allowed visits or use of the commissary, and are limited to one telephone call per week." (Id. at ¶ 6) Whenever they are removed from their cells RHU inmates are subjected to a strip search, and are restrained using

handcuffs, leg irons, and a retrieval chain.  (Id. at ¶ 9) Due to the elevated security concerns within the RHU, their cells are searched each time they are removed from the cell, and every week to ten days for those who do not leave their cells.  (Id. at ¶ 14)

SCDC recognizes that long hair, especially in the form of dreadlocks, creates multiple security risks.  (Harouff Aff. ¶¶ 10-13, 15) Long hair and beards provide hiding spaces for contraband, including drugs and factory-made or inmate-produced handcuff keys.  (Id. at ¶ 10-11) Long hair cannot be easily searched on a visual basis, but must be physically searched by an officer running his fingers through the hair to detect prohibited items.  (Id. at ¶ 12) Dreadlocks are banned throughout SCDC because "[t]here is a history of prisoners placing razor blades, needles, hooks, pins, staples, and other small objects capable of being sharpened in dreadlocks to be used as 'traps' to injure officers.  This danger can lead to an increased risk of searches not being properly performed, thus allowing contraband to be moved within the prison environment."  (Id.)

SCDC's goal through the use of the RHU "is to create a system whereby the inmate is working towards returning to the general population through good behavior and compliance with the rules" because there is only room for 144 RHU inmates.  (Harouff Aff. ¶ 19) Significantly, when inmates in the general population refuse to comply with the general grooming policy they are written up for failing to obey an order and subjected to the internal discipline system at SCDC.  (Id. at ¶ 18) This system leads to a loss of privileges in an effort to compel compliance, and can eventually lead to disciplinary detention in the RHU, whereby such inmates become subject to the RHU grooming standard.  (Id.) Thus, a mechanism is in place to ensure short hair among even the general population.  (See id.)

Requiring RHU inmates to have short hair and beards means less time is required to

search such inmates, and thus the unit operates more efficiently.  (Harouff Aff. ¶ 13) Efficiency

is such a significant concern because there is a limited number of correctional officers and other

resources available within SCDC.  (Id. at ¶ 19) Moreover, barring long hair and dreadlocks

results in personnel not being exposed to the physical risks of encountering traps hidden in an

inmate's hair.  (Id. at ¶ 13) Of additional note is that inmates who are confined in the RHU

nonetheless have to be transported outside the confines of the unit for medical treatment and

court proceedings, and there are times when they must be housed elsewhere.  (Harouff Aff. ¶ 15)

Escapes are an ever-present concern for SCDC, and inmates who are allowed to have long hair

and beards can more easily alter their appearance following an escape.  (Id.)

     As the Fourth Circuit has already determined, "[l]ong hair makes it possible for inmates

to hide contraband in their hair and makes it more difficult for prison officials to identify

inmates." Burke, 842 Fed. Appx. at 838.  Thus, as a matter of law, RHU's grooming policy

serves a compelling government interest. *See* Hines v. South Carolina Dep't of Corrections, 148

F.3d 353, 358 (4th Cir. 1998) (noting SCDC's efforts to "suppress contraband, . . . maintain

discipline and security within the prison, and prevent inmates from quickly changing their

appearance" are not only legitimate penological interests, they are "compelling."); McRae v.

Johnson, 261 Fed. Appx. 554, 558 (4th Cir. 2008) (determining the Virginia Department of

Corrections showed a compelling government interest in its grooming policy barring hair

extending beyond the shirt collar); 42 U.S.C. § 2000cc-1(a)(1); Longoria v. Dretke, 507 F.3d

898, 903-04 (5th Cir. 2007) (noting that maintaining security within a prison is a compelling state

interest); Washington v. Klem, 497 F.3d 272, 283 (3rd Cir. 2007) ("Interests in safety and health

play a particularly important role in the institutional setting.").

     This is also the least restrictive means of furthering safety and security within the RHU

because SCDC does not have the personnel or facilities to tailor incarceration to an inmate's

wishes.  (Harouff Aff. ¶ 19) As explained by Deputy Warden Harouff,

> [i]f inmates were allowed to assert a religious exemption for complying with the
> grooming policy, it is likely each inmate who desired to deviate from the standard
> would claim such a religious exemption.  This would place the correctional
> officers who have frequent interaction with the inmates in the position of having
> to gauge whether an inmate has a sincere religious belief or not.  On such a large
> scale as a prison, this would be very problematic and probably lead to additional
> lawsuits anytime the prisoner's assertion of a religious exemption was not blindly
> accepted at face value.

(Harouff Aff. ¶ 20) More significant is that such a system of religious exemption would

reintroduce the security risks presented by inmates with dreadlocks, both in terms of contraband,

hazards to SCDC employees, and difficulty in identifying inmates both within the prison and in

case of escape.  (Id. at ¶¶ 10-13, 15, 21)  Burke, 842 Fed. Appx. at 838 (noting long hair "makes

it more difficult for prison officials to identify inmates.").  Accordingly, Defendants are entitled

to summary judgment regarding Plaintiff's attempt to obtain injunctive relief under RLUIPA.  42

U.S.C. § 2000cc-1(a); Cutter v. Wilkinson, 544 U.S. 709, 722 (2005) ("We do not read the

RLUIPA to elevate accommodation of religious observances over an institution's need to

maintain order and safety."); Turner, 482 U.S. at 84-85 ("Running a prison is an inordinately

difficult undertaking that requires expertise, planning, and the commitment of resources, all of

which are peculiarly within the province of the legislative and executive branches of

government."); Lyons, 461 U.S. at 112 (noting "normal principles of equity, comity and

federalism . . . should inform the judgment of federal courts when asked to oversee state law

enforcement authorities."); Hoevenaar v. Lazaroff, 422 F.3d 366, 368 (6th Cir. 2005) (noting

great deference to views of prison officials "is mandated by the legislative history of RLUIPA.");

Murphy v. Missouri Dep't of Corrections, 372 F.3d 979, 987 (8th Cir. 2004) (noting the same

level of deference is given to prison officials under RLUIPA as existed under the predecessor

Religious Freedom Restoration Act); FED. R. CIV. P. 56(a).

**VII.   Defendants are entitled to summary judgment as to Plaintiff's First Amendment claim because it is facially neutral, and because it is rationally related to legitimate governmental interests.**

Due to SCDC's grooming policy, Plaintiff asserts a First Amendment claim pursuant to section 1983 for religious discrimination, contending he is Rastafarian.  (*See* Dkt. 1 at 4 & Dkt 1-2)  To the extent this Honorable Court deems this claim to have been properly exhausted, (*cf.* Section I, *supra*), Defendants are nonetheless entitled to summary judgment.

"The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices."  Morrison, 239 F.3d at 656.  Yet "[c]ustom incarceration tailored to an individual inmate's wishes is simply not possible because of the facility capacity and staffing requirements for such a system" within SCDC.  (Harouff Aff. ¶ 19)  Instead, the RHU grooming policy applies to everyone in the RHU, regardless of religious affiliation, in an effort to increase safety and security.  (Id. at ¶¶ 10-16) The policy is neutral as to religion because "it proscribes conduct without regard to whether that conduct is religiously motivated or not."  Hines, 148 F.3d at 357 (citing Employment Div'n, Dep't of Human Resources v. Smith, 494 U.S. 872, 876-79 (1987)).  As in Hines, while here the RHU grooming policy "may have an incidental effect of preventing [] [i]nmates from wearing their hair and beards as their religion prescribes," it "is a neutral and generally applicable regulation, and, therefore, does not violate the Free Exercise Clause."  148 F.3d at 358.  Accordingly, Defendants are entitled to summary judgment.  FED. R. CIV. P. 56(a).

Moreover, "a prison regulation that impinges on an inmate's free exercise rights is valid if it is reasonably related to legitimate penological interests."  Hines, 148 F.3d at 358 (citing

O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)).  Only a rational relationship must be shown between SCDC's objective, i.e., safety and security within prisons, and the means it chooses to accomplish the objective.  Id.  The Fourth Circuit has determined that SCDC's efforts to "suppress contraband, . . . maintain discipline and security within the prison, and prevent inmates from quickly changing their appearance" are not only legitimate penological interests, they are "compelling."  Id.  It further determined the grooming policy at issue in that case, which is substantially the same as the one applicable to the RHU, was "an eminently rational means of achieving the compelling governmental and penological interests of maintaining order, discipline and safety in prisons."  Id.  Because the RHU grooming policy is rationally related to legitimate governmental interests, it must be upheld under the First Amendment, and Defendants are therefore entitled to summary judgment as to Plaintiff's First Amendment claim.  Id.; FED. R. CIV. P. 56(a).

## VIII.   Defendants are entitled to summary judgment regarding Plaintiff's Eighth Amendment excessive force claim because Plaintiff fails to state a claim against them upon which relief may be granted.

A complaint "'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'  Elliott v. Am. States Ins. Co., 883 F.3d 384, 395 (4th Cir. 2018) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (additional internal citation omitted)); see also Francis v. Giacomelli, 588 F.3d 186, 196-97 (4th Cir. 2009) (requiring specific facts must be pled to establish plausibility); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (noting a court is not required to accept as true "unwarranted inferences, [or] unreasonable conclusions").  "[N]aked assertions" and "unadorned conclusory allegations" lacking "factual enhancement" are insufficient to properly state a claim for relief.  Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 543 (4th Cir. 2013) (internal citations and quotation

marks omitted).

Defendants recognize that as a pro se litigant, Plaintiff is accorded liberal construction and held to a less stringent standard than would be applicable to pleadings drafted by an attorney. *See* Erickson v. Pardus, 551 U.S. 89 (2009) (*per curiam*). Yet while Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only a short and plain statement of the claim showing that the pleader is entitled to relief. . . . this rule 'requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" Bing v. Brivo Sys., LLC, 959 F.3d 605, 616 (4th Cir. 2020) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)); *see also* Weller v. Department of Soc. Svcs., 901 F.2d 387, 391 (4th Cir. 1990) (noting a court may not ignore a failure to plead sufficient facts for a viable action). Thus, "a court may not construct the plaintiff's legal arguments for him." Mickle v. Ahmed, 444 F.Supp.2d 601, 613 (D.S.C. 2006) (citing Small v. Endicott, 998 F.2d 411 (7th Cir. 1993)). Nor may it "'conjure up questions never squarely presented' to the court." Id. (quoting Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985)).

"To establish personal liability under § 1983, ... the plaintiff must 'affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights.'" Williamson v. Stirling, 912 F.3d 154, 170 (4th Cir. 2018) (quoting Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation omitted and alteration in original)). In other words, "the official's 'own individual actions' must have 'violated the Constitution.'" Id. (quoting Ashcroft, 556 U.S. at 676).

Here, Plaintiff identified an action under the Eighth Amendment, (Dkt. 1 at 4), and asserted he was "slam[m]ed on the ground" resulting in an injury to his lower back. (Id. at 6) To the extent this Honorable Court deems this claim to have been properly exhausted, (*cf.* Section I,

*supra*), Defendants are nonetheless entitled to summary judgment because Plaintiff does not identify on what date this event purportedly occurred, nor whether it happened at Kirkland or Perry, and most significantly, nowhere is it alleged that any specific Defendant was the individual who purportedly slammed Plaintiff on the ground.  (*Cf.* Dkt. 1) Accordingly, Plaintiff fails to state a claim for relief for excessive force which may be granted against Defendants, and each is therefore entitled to summary judgment.  <u>Ashcroft</u>, 556 U.S. at 678; <u>Elliott</u>, 883 F.3d at 395; <u>Vitol</u>, 708 F.3d at 543; <u>Francis</u>, 588 F.3d at 196-97; <u>Giarratano</u>, 521 F.3d at 302; <u>Bing</u>, 959 F.3d at 616; <u>Weller</u>, 901 F.2d at 391; <u>Mickle</u>, 444 F.Supp.2d at 613; Fed. R. Civ. P. 56(a).

## IX.    Defendants are entitled to summary judgment regarding Plaintiff's Eighth Amendment claim regarding a purported lack of medical care because Plaintiff fails to state a claim against them upon which relief may be granted.

Plaintiff identified an Eighth Amendment claim, (Dkt. 1 at 4), and asserted he was denied adequate treatment for his low back injury, and that he suffered humiliation and a mental breakdown for which he was denied access to SCDC's Crisis Stabilization Unit.  (<u>Id</u>. at 6) To the extent this Honorable Court deems this claim to have been properly exhausted, (*cf.* Section I, *supra*), Defendants are nonetheless entitled to summary judgment.

Liability arising under the Eighth Amendment "'must involve more than ordinary lack of due care for the prisoner's interests or safety….It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."  <u>Wilson v. Seiter</u>, 501 U.S. 294, 299 (2001) (quoting <u>Whitney v. Albers</u>, 475 U.S. 312, 319 (1986)) (emphasis in original).  A prison official "is deliberately indifferent to a substantial risk of harm to [an inmate] when that [official] 'knows of and disregards' the risk."  <u>Parrish ex rel. Lee v. Cleveland</u>, 372 F.3d 294, 302 (4th Cir. 2004) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)); *see also* <u>Brown v. N.C. Dep't of Corrections</u>, 612 F.3d 720, 723 (4th

Cir. 2010) (noting a prison official is deliberately indifferent when he "knows of and disregards an excessive risk to inmate health or safety").

It is insufficient to establish that the official should have known of a particular risk. Farmer, 511 U.S. at 837. Rather, it is necessary to show that the official was aware of facts from which the inference of substantial risk of harm could have been drawn, and that he actually "[drew] the inference." Id.; see also Raynor v. Pugh, 817 F.3d 123, 128 (4th Cir. 2016). Significantly, even a showing of negligence by prison officials does not rise to the level of deliberate indifference. Davidson v. Cannon, 474 U.S. 344, 347-48 (1986); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). As recognized in Farmer, "an official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot . . . be condemned as the infliction of punishment," and is therefore outside the protections of the Eighth Amendment. 511 U.S. at 838.

"In order to establish a claim of deliberate indifference to medical need, the need must be both apparent and serious, and the denial of attention must be both deliberate and without penological objective." Grayson, 195 F.3d at 695. In other words, an official must know of, appreciate, and disregard an excessive risk to inmate health to be liable under the Eighth Amendment. See Brown, 612 F.3d at 723; Parrish, 372 F.3d at 302. Here, there is no allegation any Defendant was aware of facts which would indicate Plaintiff suffered an "apparent and serious" health condition, (cf. Dkt. 1), whether related to his low back or mental condition, and thus Plaintiff cannot prevail under the objective portion of an Eighth Amendment analysis. Grayson, 195 F.3d at 695; Farmer, 511 U.S. at 837; Raynor, 817 F.3d at 128. There is also no allegation that any Defendant, despite appreciating Plaintiff's need for medical care, deliberately chose to deny Plaintiff such care. (Cf. id.) Farmer, 511 U.S. at 837; Raynor, 817 F.3d at 128.

Accordingly, Defendants are entitled to summary judgment regarding Plaintiff's Eighth Amendment claim as it relates to a denial of medical care. *See* FED. R. CIV. P. 56(a); Grayson, 195 F.3d at 695; Farmer, 511 U.S. at 837; Raynor, 817 F.3d at 128; Parrish, 372 F.3d at 303; Ashcroft, 556 U.S. at 678; Elliott, 883 F.3d at 395; Vitol, 708 F.3d at 543; Francis, 588 F.3d at 196-97; Giarratano, 521 F.3d at 302; Bing, 959 F.3d at 616; Weller, 901 F.2d at 391; Mickle, 444 F.Supp.2d at 613; FED. R. CIV. P. 56(a).

**X.     Defendants are entitled to summary judgment regarding any supervisory liability claim asserted by Plaintiff because he alleged no facts from which it may be determined any Defendant knew a subordinate was engaged in conduct that posed an unreasonable risk of constitutional injury.**

To the extent this Honorable Court construes Plaintiff to allege a claim for supervisory liability, Defendants recognize that in an action brought pursuant to section 1983

> a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) . . . there was an "affirmative causal link" between his inaction and the constitutional injury."

King v. Rubenstein, 825 F.3d 206, 224 (4th Cir. 2016) (quoting Shaw v. Stroud, 13 F.3d 791, 799) (4th Cir. 1994) (extraneous quotation mark and punctuation format in original).

As noted *supra*, a complaint "'must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" Elliott, 883 F.3d at 395 (quoting Ashcroft, 556 U.S. at 678 (additional internal citation omitted); *see also* Francis, 588 F.3d at 196-97 (requiring specific facts must be pled to establish plausibility); Giarratano, 521 F.3d at 302 (noting a court is not required to accept as true "unwarranted inferences, [or] unreasonable conclusions"). Here, there are no factual allegations from which one could determine any Defendant "knew" one of his subordinates "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury." King, 825 F.3d at 224. Accordingly, to the extent

this Honorable Court determines Plaintiff to have raised a claim for supervisory liability,

Defendants are entitled to summary judgment.  FED. R. CIV. P. 56(a).

**XI.    Defendants are entitled to summary judgment to the extent Plaintiff seeks injunctive relief beyond that which would otherwise be applicable to his claim under RLUIPA, because Plaintiff fails to state a claim for relief which may be granted.**

Plaintiff seeks an undefined "permanent injunction," but does not indicate what he wishes

this Honorable Court to enjoin.  (Dkt. 1 at 6) To the extent Plaintiff prayed for an injunction

beyond what would normally appertain to his RLUIPA action, Plaintiff fails to state a claim for

relief which may be granted, and Defendants are therefore entitled to summary judgment.  FED.

R. CIV. P. 56(a); Pashby v. Delia, 709 F.3d 307, 319 (4th Cir. 2013) (noting "injunctions are

'extraordinary remed[ies] involving the exercise of very far-reaching power.'"); O'Shea, 414 U.S.

at 495-96 ("Past exposure to illegal conduct does not in itself show a present case or controversy

regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.");

Elliott, 883 F.3d at 395; Vitol, 708 F.3d at 543; Francis, 588 F.3d at 196-97; Giarratano, 521

F.3d at 302; Bing, 959 F.3d at 616; Weller, 901 F.2d at 391; Mickle, 444 F.Supp.2d at 613.

**XII.    Defendants are entitled to summary judgment because they are protected by qualified immunity in their individual capacities.**

Qualified immunity protects government officials "from personal liability for civil

damages stemming from 'bad guess in gray areas and ensures that they are liable only for

transgressing bright lines.'"  Santos v. Frederick Cnty. Bd. of Comm'rs., 725 F.3d 451, 468 (4th

Cir. 2013) (quoting Willingham v. Cooke, 412 F.3d 553, 558 (4th Cir. 2005); *see also* Stanton v.

Sims, 571 U.S. 3, 5 (2013) (noting qualified immunity provides officers the "breathing room to

make reasonable but mistaken judgments.").  The strict marching order of traditional two-step

qualified immunity analysis has been modified such that courts are no longer required, as a

predicate matter, to determine whether a constitutional violation has even occurred.  Pearson v.

Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the analysis should be addressed first in light of the circumstances in the particular case at hand.") In such cases, the threshold question is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 200-01 (2001).

To prevent the bar of qualified immunity, the right at issue must have been defined "in light of the specific context of the case, not as a broad general proposition." McKinney v. Richland County Sheriff's Dep't, 431 F.3d 415, 417 (4th Cir. 2005) (internal citations omitted). The Supreme Court has recently noted: "We have repeatedly told courts not to define clearly established law at too high a level of generality." City of Tahlequah, Oklahoma v. Bond, 595 U.S. _____, _____, (2021) (per curiam) (slip op., at 3) (citing Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). As the Court explained, "[i]t is not enough that a rule be suggested by then-existing precedent; 'the rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted."'" Id. (quoting District of Columbia v. Wesby, 583 U.S. _____, _____ (2018) (slip op., at 14) (additional internal citation omitted)). Thus, to prevent the application of qualified immunity, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" Rivas-Villegas v. Cortesluna, 595 U.S. _____, ____ (2021) (per curiam) (slip op., at 4) (quoting White v. Pauly, 580 U.S. ____, ____ (2017) (per curiam) (slip op., at 6)). Significantly, where any precedent is "materially distinguishable" on a factual basis qualified immunity applies. Rivas-Villegas, 595 U.S. at ____ (slip op., at 5); see also San Francisco v. Sheehan, 575 U.S. 600, 611 n.3 (2015) ("Because of the importance of qualified immunity to 'society as a whole,' the Court often

corrects lower courts when they wrongly subject individual officers to liability.").  Because there are no Fourth Circuit or Supreme Court cases delineating a constitutional violation by government officials in the circumstances alleged by Plaintiff to have occurred in the case *sub judice*, there is no way for reasonable officers to have clearly known their conduct, as alleged, was unlawful.  *See* id. at 417-18; Saucier, 533 U.S. at 200-01; Santos, 725 F.3d at 468. Accordingly, Defendants are entitled to summary judgment as a matter of law on qualified immunity grounds.  FED. R. CIV. P. 56(a).

## **PLAINTIFF'S STATE LAW CLAIMS**

**XIII.   Defendants are entitled to summary judgment regarding Plaintiff's claims premised on the South Carolina Constitution because South Carolina does not recognize a private cause of action for constitutional violations.**

Plaintiff asserts Defendants violated Article I, Section 3 of the South Carolina Constitution in his Complaint.  (Dkt. 1 at 4) Plaintiff's claims are barred because South Carolina does not recognize private causes of action for constitutional violations.  *See* Palmer v. State, 427 S.C. 36, 46, 829 S.E.2d 255, 260 (Ct. App. 2019), *r'hrg denied* (July 12, 2019), *cert. denied* (May 28, 2021) ("Considering the South Carolina Constitution does not provide for money damages for civil rights violations and the legislature has not enacted an enabling statute, we affirm the circuit court on this issue."); *see also* Shuler v. Orangeburg Cty. Sheriff's Dep't, No. 5:19-88-MGL-PJG, 2019 WL 9341416, at *5 (D.S.C. July 8, 2019) ("[A]s to [the p]laintiff's claims that the defendants violated her rights under the South Carolina Constitution, no private right of action for damages exists to vindicate those rights."), report and recommendation adopted, No. 5:19-00088-MGL, 2020 WL 19323781, at *5 n.7 (D.S.C. Apr. 22, 2020) ("To the extent Shuler asserts state law claims based on violations of the South Carolina Constitution, South Carolina does not recognize a cause of action for monetary damages for constitutional

violations."). Accordingly, Defendants are entitled to summary judgment. FED. R. CIV. P. 56(a).

## CONCLUSION

FOR THE REASONS SET forth herein, Defendants pray this Honorable Court to GRANT to each summary judgment.

Respectfully submitted,

**DOYLE, TATE & MCDADE, P.A.**

By:  s/J. Victor McDade
       J. Victor McDade, Fed ID #2790
       Post Office Box 2125
       Anderson, SC 29622
       Tel:  (864) 224-7111
       Fax: (864) 226-1517
       jvmcdade@dotmlaw.com
       *Attorney for the  Defendants*

Dated: November 16, 2022